# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

DATREC, LLC,

       Plaintiff,

   v.

EPIC SYSTEMS CORPORATION,

     Defendant.

Civil Action No.: 3:21-cv-00257-wmc

## <u>MOTION TO DISMISS</u>

**QUARLES & BRADY LLP**

Kristin Graham Noel
Martha Jahn Snyder
Anita Marie Boor
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251-5000
Facsimile: (608) 251-9166
kristin.noel@quarles.com
martha.snyder@quarles.com
anita.boor@quarles.com

*Attorneys for Defendant Epic Systems Corporation*

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND ................................................................................. 3

   A.  The Parties and the Instant Suit .................................................................. 3

   B.  The Asserted Patents .................................................................................... 4

      1.  U.S. Patent No. 8,156,158 ....................................................................... 4

      2.  U.S. Patent No. 8,381,309 ....................................................................... 7

III. LEGAL STANDARDS ......................................................................................... 9

   A.  The Court May Properly Decide Patent Eligibility on a Rule 12 Motion. ..................... 9

   B.  Abstract Ideas Are Ineligible for Patenting Under the Two-Step Test of *Alice*. ........... 10

IV.  ARGUMENT ....................................................................................................... 11

   A.  The '158 Patent Is Directed to Patent-Ineligible Subject Matter. .................................. 11

      1.  Claim 1 is directed to an abstract method under *Alice* step 1 ................................. 11

      2.  Claim 1 contains no inventive concept under *Alice* step 2. ................................... 14

      3.  Independent claims 17 and 23 are directed to the same non-inventive abstract idea as claim 1. ........................................................................................................ 15

      4.  Each of the dependent claims also is ineligible. .................................................. 18

   B.  The '309 Patent Is Directed to Patent-Ineligible Subject Matter. .................................. 21

      1.  Claim 1 is directed to an abstract method under *Alice* step 1 ................................. 21

      2.  Claim 1 contains no inventive concept under *Alice* step 2. ................................... 24

      3.  Independent claim 9 is directed to the same non-inventive abstract idea as claim 1. 27

      4.  Each of the dependent claims also is ineligible. .................................................. 29

   C.  No Claim Construction Issues or Factual Disputes Prevent the Court From Deciding This Issue at This Stage of the Case. .......................................................................... 31

V.   CONCLUSION .................................................................................................... 33

i

# TABLE OF AUTHORITIES

## Cases

*Adaptive Streaming Inc. v. Netflix, Inc.*,
  836 F. App'x 900, 2020 WL 7334126 (Fed. Cir. 2020) ........................................................ 14

*Alice Corporation v. CLS Bank*,
  573 U.S. 208 (2014) ............................................................................................................. passim

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................. 9

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ...................................................................................... 10, 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................. 9

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) .......................................................................................... 32

*Boom! Payments, Inc. v. Stripe, Inc.*,
  839 F. App'x 528 (Fed. Cir. 2021) .................................................................................... 13, 19

*Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*,
  955 F.3d 971 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 1053 (2021) .............................. 25, 26

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018) ......................................................................................... passim

*CardioNet LLC v. InfoBionic, Inc.*,
  816 F. App'x 471, 2020 WL 3564691 (Fed. Cir. 2020) .................................................... 12

*Cleveland Clinic Foundation v. True Health Diagnostics LLC*,
  859 F.3d 1352 (Fed. Cir. 2017) .......................................................................................... 9

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ...................................................................................... 20, 23

*E.E.O.C. v. Concentra Health Servs., Inc.*,
  496 F.3d 773 (7th Cir. 2007) .............................................................................................. 9

*EasyWeb Innovations, LLC v. Twitter, Inc.*,
  689 F. App'x 969, 970, 2017 WL 1969492 (Fed. Cir. 2017) ............................................. 23

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) .................................................................................... 10, 12, 23

*Enco Sys., Inc. v. DaVincia, LLC*,
  845 F. App'x 953, 2021 WL 855856 (Fed. Cir. 2021) ........................................................ 32

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) .......................................................................................... 22

ii

*FairWarning IP LLC v. Iatric Systems, Inc.,*
   839 F.3d 1089 (Fed. Cir. 2016) ............................................................................... 23

*Genetic Technologies, Ltd. v. Merial LLC,*
   818 F.3d 1369 (Fed. Cir. 2016) ............................................................................ 2, 9

*Gottschalk v. Benson,*
   409 U.S. 63 (1972) ..................................................................................................... 10

*Killingsworth v. HSBC Bank Nevada, N.A.,*
   507 F.3d 614 (7th Cir. 2007) .................................................................................... 9

*Mayo Collaborative Services v. Prometheus Labs., Inc.,*
   566 U.S. 55 (2012) ..................................................................................................... 25

*Mortg. Application Techs., LLC v. MeridianLink, Inc.,*
   839 F. App'x 520, 2021 WL 97347 (Fed. Cir. 2021) ....................................... 13, 14

*NetSoc, LLC v. Match Grp., LLC,*
   838 F. App'x 544, 2020 WL 7828777 (Fed. Cir. 2020) ........................................ 23

*Peterson v. Artisan and Truckers Cas. Co*.,
   No. 19-cv-102-WMC, 2019 WL 2717099 (W.D. Wis. June 28, 2019) .................. 3

*Preservation Wellness Techs. LLC v. Allscripts Healthcare Sols*.,
   No. 2:15-CV-1559-WCB, 2016 WL 2742379 (E.D. Tex. May 10, 2016)
   (Bryson, J.), *aff'd sub nom. Pres. Wellness Techs. LLC v. Allscripts*
   *Healthcare Sols. Inc.*, 684 F. App'x 970 (Fed. Cir. 2017) ........................ 17, 20, 24

*SAP America, Inc. v. InvestPic, LLC,*
   898 F.3d 1161 (Fed. Cir. 2018) ........................................................................ 2, 9, 21

*Secured Mail Sols. LLC v. Universal Wilde, Inc.,*
   873 F.3d 905 (Fed. Cir. 2017) ................................................................................. 32

*Simio, LLC v. FlexSim Software Prods., Inc.,*
   983 F.3d 1353 (Fed. Cir. 2020) .................................................................. 10, 14, 30, 31

*Solutran, Inc. v. Elavon, Inc.,*
   931 F.3d 1161 (Fed. Cir. 2019), *cert. denied,* 140 S. Ct. 2515 (2020) ................... 26

*Two-Way Media Ltd. v. Comcast Cable Communications, LLC,*
   874 F.3d 1329 (Fed. Cir. 2017) ............................................................................... 19

**Statutes**

35 U.S.C. § 101 ............................................................................................................. 10

Pursuant to Rule 12(b)(6), Defendant Epic Systems Corporation ("Epic") moves to dismiss Plaintiff DatRec, LLC's ("DatRec") Complaint for failure to state a claim upon which relief can be granted. Specifically, the two patents asserted in the Complaint are directed to non-inventive abstract ideas, which are not eligible for patenting under 35 U.S.C. § 101. Accordingly, Epic respectfully requests that the Court find the claims of the patents invalid under § 101 and dismiss the Complaint with prejudice.

## I.       INTRODUCTION

Each of the asserted patents are directed to abstract ideas and fail to imbue those ideas with any inventive concept. In *Alice Corporation v. CLS Bank, International*, the Supreme Court held that such non-inventive abstract ideas fall outside the subject matter specified in 35 U.S.C. § 101 as eligible for patenting. 573 U.S. 208, 216 (2014). Because the subject matter of the asserted patents—each of which was prosecuted and issued before *Alice*—fails to meet the patentability requirements of 35 U.S.C. § 101, the Court should hold they are invalid and dismiss this case with prejudice.

The first patent—U.S. Patent No. 8,156,158—is directed to the abstract idea of collecting information, verifying the information by cross-referencing data points, and filtering the information into subsets for various applications. The second patent—U.S. Patent No. 8,381,309—is directed to collecting information and then establishing communication preferences based on the reliability of that information. These are quintessential abstract concepts—and not new ones at that. People have been collecting information, cross-checking it against other information, sorting the information into categories, and making decisions based on it for eons.

Neither patent imbues these abstract ideas with any inventive concept. They do not teach any novel means of *how* to accomplish the abstract ideas. Rather, the specifications themselves

QB\68580957.4

teach that the ideas may be completed using databases constructed with already-known concepts and may be facilitated by using conventional computers, conventional servers, and other conventional systems. Consequently, the patents are not directed to solving a known problem in the database or computer fields; they merely tell the reader to carryout age-old human activities with already-understood computerized techniques.

This motion is ripe for decision now. The claims at-issue do not require formal construction as their terms are either explicitly defined in the specifications or can be understood by their plain and ordinary meanings. Moreover, no constructions that DatRec could propose would save the claims from their non-inventive abstractness. Beyond that, no factual issues would prevent the Court from deciding this motion now. The specifications themselves teach that the means of carrying out the claimed methods and systems are conventional; no discovery is needed on that point.

As this Court is aware, patent litigation is expensive and time-consuming. In cases such as this one, where the asserted patents are facially directed to patent-ineligible subject matter, the Court should grant a motion to dismiss under Rule 12(b)(6). *Genetic Technologies, Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016) (citation omitted); *see also SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (collecting recent cases). Accordingly, Epic respectfully requests that the Court grant this motion, find the asserted patents directed to patent-ineligible subject matter, and dismiss the Complaint with prejudice.

## II.    FACTUAL BACKGROUND[1]

### A.    The Parties and the Instant Suit

DatRec filed the Complaint against Epic on April 16, 2021. (Dkt. 1). Pursuant to a stipulated extension granted by the Court, Epic's deadline to Answer or otherwise respond to the Complaint is June 10, 2021. (Dkt. 13). At the time of filing this Motion, Epic has not yet filed an Answer.

The Complaint asserts that Epic allegedly infringes an unspecified number of claims of two patents—U.S. Patent No. 8,156,158 ("the '158 Patent") and U.S. Patent No. 8,381,309 ("the '309 Patent") (collectively, "the patents-in-suit").[2]

Epic is a Wisconsin corporation with its principal place of business in Verona, Wisconsin. (Dkt. 1, ¶ 2). It is a leader in the healthcare software industry and offers patients and their healthcare providers solutions to manage electronic health records ("EHR"). (*See id.*, ¶¶ 8-9, 16-17).[3]

DatRec reportedly is a Texas limited liability company with its principal place of business in Houston, Texas. (*Id.*, ¶ 1). It is not alleged to provide any goods or services; rather, it appears to be in the business of acquiring and asserting patents for profit.[4]

---

[1] Because the Court must decide this motion on the factual allegations in the pleadings, this Background section cites to the Complaint and its attachments, unless otherwise noted.

[2] A copy of the '158 Patent is attached to the Complaint as Exhibit A (dkt. 1-1) and a copy of the '309 Patent is attached to the Complaint as Exhibit B (dkt. 1-2). Epic cites to them respectively as "158 Pat." and "309 Pat."

[3] Epic disputes that any of its software solutions infringe any asserted claim.

[4] Starting in early 2020, DatRec initiated a wave a suits against a wide variety of entities. As of June 9, 2020, it has asserted the '158 Patent against 15 entities and the '309 Patent against 21 entities. Appendix A summarizes these suits. This Court can consider judicially noticeable facts on a motion to dismiss. *See, e.g., Peterson v. Artisan and Truckers Cas. Co.*, No. 19-cv-102-WMC, 2019 WL 2717099, *1, n.2 (W.D. Wis. June 28, 2019).

### B.       The Asserted Patents

The two patents-in-suit have overlapping named inventors and share an original assignee. (*See* '158 Pat., Cover; '309 Pat., Cover). While not of the same patent family, their specifications disclose similar teachings. (See *id.*).

Both patents are broadly directed to methods and systems that provide and use a "database" of "verified" data to accomplish various tasks (e.g., sorting data into subsets, defining permitted levels of communication). (*See* '158 Pat., Abstract ("A verified database of a plurality of identified individuals is provided[ and] is processed in accordance with one or more parameters or conditions … and a sub-group database is created…."); '309 Pat., Abstract ("A database is provided which comprises verified data[, which] allows for authenticating the identity of individuals[ and defines] levels of permitted communications….")). Neither patent teaches any novel way of providing or constructing the database; nor do they teach a novel way of using the database to accomplish the specified tasks. Rather, as explained herein, the patents use conventional methods to carryout age-old human activities, like sorting and organizing information and facilitating communication.

### 1.       U.S. Patent No. 8,156,158

The '158 Patent relates to a "Method and System for Use of a Database of Personal Data Records." The specification teaches providing a "verified database" of a plurality of individuals and processing the database with selected parameters to create a sub-group database. ('158 Pat, 2:50-62). Essentially, the specification teaches the acts of collecting information on multiple people, verifying the information by cross-referencing data points, and filtering the information into subsets for various applications.

On providing a "verified database," the specification teaches that individuals are permitted to enter "individual-associated data bits"—dubbed "IDBs"—into a conventional computerized

QB\68580957.4

system(s) (*id.* at 17:1-18:53), wherein the IDBs comprise at least one "personal identifier" (i.e., a piece of data on the individual) and "relationship data" (i.e., a piece of data on a related individual and the type of relationship). (*Id.* at 2:63-3:1; *see also id.* at 8:31-43 (defining "IDBs"), 8:44-61 (defining "personal identifier") & 8:62-9:11 (defining "relationship data")).

The IDBs are then processed[5] to create "individual-identifier data sets," dubbed "IDSs"— i.e., a data set pertaining to an identified individual. (*Id.* at 9:12-38). The specification teaches that this processing may involve cross-referencing or comparing the data from different sources, thereby constructing a "verified database." (*Id.* at 11:60-12:11). Essentially, the data is "verified" when they are cross-referenced and meet an unspecified threshold of reliability/authenticity— leaving each user to decide how to define the applicable threshold. (*Id.* at 11:60-12:36; *see also id.* at 25:67-26:4). The specification does not teach novel techniques for *how* to process or verify the data, just that it may be done with conventional computer systems and with techniques known in the art. (*Id.* at 17:1-18:5, 22:1-4).

The specification then teaches that the "verified database" is filtered based on one or more selected parameters or conditions to create a sub-database. (*Id.* at 3:7-15). For example, in one disclosed embodiment, the database may be processed based on medical parameters (e.g., a disease, a medical condition, a genotype, a phenotype, a family relationship, etc.) to "creat[e]" a medical database. (*Id.* at 3:45-51). Again, the specification does not teach novel techniques for

---

[5] The claims and the specification of the '158 Patent use the terms "processing" and "processed" to describe various activities. For example, in the first "providing" step, a database is constructed by allowing individuals to enter IDBs and those IDBs are then "processed" to create IDSs (the details are not explained). ('158 Pat. at 2:50-3:6). Then, in the "processing" step, the constructed database is processed by filtering the database based on a selected parameter (again, the details are not explained). (*Id.* at 3:7-15). While Epic reserves all rights, including to argue these terms are indefinite, what matters for purposes of this motion is that there is no explanation of "processed" or "processing" in the specification or claims that moves them out of the realm of the conventional.

*how* this processing is done, but that it may be completed with the aid of conventional computer systems. (*Id.* at 17:19-18:5),

DatRec claims Epic infringes "one or more claims 1-23," but provides a claim chart for only claim 1, which reads:

> 1. A method for using and managing a database, the method comprising:
>
> > [a] providing a verified database of a plurality of identified individuals, the verified database comprising a plurality of individual-identifier data sets (IDSs) and relationship data; and
> >
> > [b] processing said verified database in accordance with one or more parameters or conditions selected in accordance with at least one medical application and creating a sub-group database including data records of the individuals from the verified database having said one or more selected parameters or conditions, thereby allowing collection of data comprising one or more selected parameters or conditions and delivery of at least part of the collected data to one or more users and enable to apply data from said verified database to provide personalized medicine service to at least one of said identified individuals;
> >
> > [c] wherein said providing of the verified database comprises: permitting a plurality of individuals to enter individual-associated data bits (IDBS) into a computerized system, each of the IDBs comprising at least one personal identifier relating to the individual and relationship data comprising data on one or more related individuals and the nature of relationship;
> >
> > [d] processing the entered IDBs to generate the IDS, one for each identified individual, being either said individual who has entered the individual-associated data bits or one of the related individuals and construct the verified database comprising IDSs of identified individuals.

('158 Pat. at Cl. 1 (brackets added)).

The "wherein" clause of claim 1, which comprises two steps—steps (c) and (d)—relates to the "providing a verified database" step (a). When read both separately and together, the claim's steps describe: collecting information on multiple people (steps (a) and (c)), verifying the information by cross-referencing data points (step (d)), and filtering the information into subsets for various applications (step (b)).

The '158 Patent has two other independent claims—claims 17 and 23, which are both directed to a "computerized system(s)" that essentially employ server systems to carry out steps

6

that are identical or substantively similar to the method steps of claim 1. The remaining claims depend from the independent claims and generally narrow the ideas contained in the independent claims. *See infra* IV.A.4.

### 2.      U.S. Patent No. 8,381,309

The '309 Patent relates to "Methods and Systems for Secure Communications over a Public Network." The specification teaches providing a database with at least some "verified" data and allowing users to define levels of permitted communication based on the verification. ('309 Pat. at 1:49-62, 3:48-58). Essentially, the specification teaches building a conventional database with information on multiple people and then establishing communication preferences based on how reliable the information is.

On providing a database of "verified" data, the specification teaches that the database may be constructed using known techniques (*id.* at 3:59-62) by allowing individuals to enter individualized data bits ("IDBs"), which are processed to create individualized data sets ("IDSs"), which are further processed to construct the database (*id.* at 2:26-35). These terms have identical or substantively similar meanings to those provided in the '158 Patent. (*See id.* at 5:11-17 (defining "IDBs" as including both personal identifiers and relationship data), 5:17-27 (defining "personal identifier" as pieces of data on the data-entering individual), 5:40-56 (defining "relationship data" as data relating to individuals with a relationship to the data-entering individual and the type of relationship) & 5:57-61 (defining "IDSs" as a set of data pertaining to an individual generated by processing IDBs)).

Also similar to the '158 Patent, the '309 Patent teaches that the data that comprises the database is "verified" when they are cross-referenced and meet an unspecified level of reliability. (*Id.* at 2:36-46, 3:37-48). The specification teaches the "level of reliability" is "a level of reliability

(confidence) in the authenticity [of data] based on correspondence between data on the individual entered by different users." (*Id.* at 4:3-7; *see also id.* at 10:50-57 (server may calculate "the relative reliability and or ratio of reliability of two data bits ….")). In other words, the more users who confirm pieces of information about an individual, the more reliable that information.

Once the database is constructed and the level of reliabilities determined (levels not set or taught by the patent), the specification teaches that users may define a communication level based on the reliability score assigned to any sender or recipient. (*Id.* at 3:4-36). The specification does not provide novel techniques for *how* the users may define these communication levels; it merely teaches that it may be accomplished through the database.

DatRec claims Epic infringes "one or more claims 1-17," but provides a claim chart for only claim 9, which reads:

> 9. A system for enabling communication between users over a communication network, the system comprising;
>
>> a server system associated with a database comprising verified data relating an individual, said server system being configured and operable to verify at least some of the data so as to authenticate an identity of the individual;
>> determining a level of reliability in authenticity based on correspondence between data on said individual entered by a plurality of related individuals; and
>> the system being configured to define one or more levels of permitted communication between individuals in the database and the verified individual on the basis of said verification.

The '309 Patent has one other independent claim—claim 1—which provides a method similar to the tasks carried out by the system of claim 9. The remaining claims depend from claims 1 and 9 in some fashion, and generally narrow the ideas contained in the independent claims. *See infra* IV.B.4.

## III.    LEGAL STANDARDS

This motion implicates standards for motions to dismiss for failure to state a claim under Rule 12(b)(6) and the patentability standards provided in 35 U.S.C. § 101.

### A.    The Court May Properly Decide Patent Eligibility on a Rule 12 Motion.

Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). The allegations must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true the plaintiff's well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). However, "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

The Federal Circuit has "repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *Genetic Techs.*, 818 F.3d at 1373 (citation omitted); *see also SAP America*, 898 F.3d at 1166 (collecting recent cases). Likewise, "claim construction is not an inviolable prerequisite to validity determinations under § 101." *Genetic Techs.*, 818 F.3d at 1374. In sum, the Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced." *Cleveland Clinic Foundation v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) (collecting cases and affirming dismissal of complaint when plaintiff "provided no proposed construction of any terms").

9

**B.      Abstract Ideas Are Ineligible for Patenting Under the Two-Step Test of *Alice*.**

Section 101 defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. This provision, however, contains long-standing judicial exceptions that laws of nature, natural phenomena, and abstract ideas are not eligible for patenting. *Alice*, 573 U.S. at 216. In particular, courts have identified various types of claims likely to be patent-ineligible, including those directed to "long-standing, well-known method[s] of organizing human behavior," *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016), "mental processes," *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016), and "mathematical formula[s]" or an "algorithm itself." *Gottschalk v. Benson*, 409 U.S. 63, 72 (1972).

To determine whether a claim is drawn to patent-ineligible subject matter, courts apply the two-step analysis set forth by the Supreme Court in *Alice*. Step one inquires whether the claim is directed to an abstract idea. *Alice*, 573 U.S. at 218. As applied to claims involving computerized systems, courts "consider whether the 'focus of the claims' is on a 'specific asserted improvement in computer capabilities or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.'" *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1285–86 (Fed. Cir. 2018) (quoting *Enfish*, *infra*); *see also Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1359 (Fed. Cir. 2020) (must consider the claim's "key advance"). "If a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea." *BSG Tech*, 899 F.3d at 1285–86.

If the claim is directed to an abstract idea, courts move to step two and "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221.

10

This "transformation into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Id.* at 221 (internal citations omitted). "[I]f a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech*, 899 F.3d at 1285–86. "Narrowing or reformulating an abstract idea does not add 'significantly more' to it." *Id.*

## IV.   ARGUMENT

Both of the patents in-suit are directed to patent-ineligible subject matter because their claims are directed to abstract ideas and contain no inventive concept.

### A.   The '158 Patent Is Directed to Patent-Ineligible Subject Matter.

DatRec claims that the '158 Patent "relates to a novel and improved manner of constructing a verified database of identified individuals capable of processing with a subgroup of at least one medical application" (dkt. 1, ¶ 7), but the claims do not cover any "manner of constructing" anything; rather, they are directed to the abstract ideas of collecting information, verifying the information by cross-referencing data points, and filtering the information into subsets for various applications. These are quintessential non-inventive abstract concepts that cannot be patented.

#### 1.   Claim 1 is directed to an abstract method under *Alice* step 1.

The "focus" of claim 1 is three-fold: (1) compiling information on multiple people into a database; (2) verifying that information by cross-referencing data points; and (3) processing the database to create a subset of data. ('158 Pat. at Cl. 1; *see also id.* at 1:6-10, 2:39-41). These concepts of generally compiling, cross-referencing, and filtering information on people are abstract as a matter of law. *BSG Tech*, 899 F.3d at 1285–86 (holding "a method of indexing wherein a user adds data to a database using 'a mechanism for posting the data as parametized items' after receiving 'summary comparison usage information' about parameters and values selected by prior

users" abstract); *Elec. Power Grp.*, 830 F.3d at 1354 (holding "a process of gathering and analyzing information of a specified content, then displaying the results" abstract); *CardioNet LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 475, 2020 WL 3564691 (Fed. Cir. 2020) (holding claims directed to monitoring physiological data and identifying arrhythmia events were directed to the abstract concept of "collecting, analyzing, and displaying data by conventional means.")).

In *Electric Power Group*, the Federal Circuit held that such concepts "fall into a familiar class of claims 'directed to' a patent-ineligible concept." 830 F.3d at 1353. In particular, the court noted that it had invalidated, as abstract, claims directed to each of the individual steps of "collecting information," "analyzing information by steps people go through in their minds, or by mathematical algorithms, without more," and "merely presenting the results of the abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation)," and that the combination of those steps similarly was abstract. *Id*. at 1353-54 (internal citations omitted). As in *Electric Power Group*, claim 1 of the '158 Patent recites an abstract method of collecting information ("wherein said providing of the verified database comprises: permitting a plurality of individuals to enter individual-associated data bits (IDBS) into a computerized system" and "thereby allowing collection of data comprising one or more selected parameters or conditions"), analyzing that information ("processing the entered IDBs to generate the IDS … and construct the verified database comprising IDSs of identified individuals" and "processing said verified database in accordance with one or more parameters or conditions selected in accordance with at least one medical application and creating a sub-group database"), and then presenting the results of that analysis ("thereby allowing … delivery of at least part of the collected data to one or more users").

The '158 Patent does not teach any novel means of compiling, cross-referencing, or filtering information. Rather, it simply invokes conventional computers and servers to complete the tasks, which does not save the claims from abstraction. ('158 Pat. at 17:1-18:5 ("The server system is configured according to the invention to carry out the above-described method for creating the main verified database including the IDSs of all identified individuals and the relationship web, based on data received from the users, being initiated in either pull or push mode."); *see also id.* at 26:58-63 ("the IDSs containing database … may be used for a variety of uses for which computer networks have not been used hitherto…)). *Mortg. Application Techs., LLC v. MeridianLink, Inc.*, 839 F. App'x 520, 526, 2021 WL 97347 (Fed. Cir. 2021) ("information storage and exchange is an abstract idea even when it uses computers as a tool or is limited to a particular technological environment").

The "verification" process for the "verified database" disclosed in the specification does not make the focus of constructing a database of information and then processing the database into subsets any less abstract. The "verification" merely involves cross-referencing or comparing data from different sources to measure their reliability. ('158 Pat. at 11:60-12:36). This is an abstract process in and of itself—and not a new one. The specification acknowledges that various methods of measuring reliability were already known in the art. (*Id.* at 22:1-5, 25:67-26:4); *see also Mortg. Application*, 839 F. App'x 520, 525 (claims directed to "process in which data is received in one format, automatically extracted, compared to a set criteria, populated into a second document, and then stored for and retrieved by a user" abstract); *Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528, 532 (Fed. Cir. 2021) (claims directed to payment escrow—i.e., "verifying consummation of a transaction"—are abstract).

Thus, claim 1 is directed to an ineligible abstract idea under *Alice* step one.

## 2.  Claim 1 contains no inventive concept under *Alice* step 2.

Claim 1 does not contain any inventive concept that transforms it into patent-eligible subject matter. The claim recites steps of providing and processing a database but does not recite anything novel about those steps. Combined with the specification—which does not teach anything other than use of off-the-shelf devices—the claimed steps themselves show the conventional nature of the claimed method. *Adaptive Streaming Inc. v. Netflix, Inc.*, 836 F. App'x 900, 904, 2020 WL 7334126 (Fed. Cir. 2020) (claims reciting only generic computer hardware, such as a "processor" not inventive); *Mortg. Application*, 839 F. App'x 520, 526 (adding computer functionality does not confer patent eligibility to an abstract idea).

Arguably, the claim's most "unconventional" feature is the "verification" process for the "verified database," but this feature is abstract for all the reasons above. The "verification process" taught by the specification is a simple compare and contrast exercise, which itself is an abstract concept and one that the prior art already disclosed. ('158 Pat. at 22:1-5, 25:67-26:4). *Boom! Payments*, 839 F. App'x 528, 532 (finding "use of an identification code does nothing more than overlay a second layer of abstraction—specifically, identity authentication—on the … procedure described by the claims.").

The claim specifies that the filtered subgroup of information may be "enable[d] to apply data from said verified database to provide personalized medicine service to at least one of said identified individuals," but does not explain *how* this would be accomplished. Moreover, this merely narrows the claimed method to a known application, which does not make it any less non-inventive. As a matter of law, narrowing or reformulating an abstract idea does not add 'significantly more' to it." *BSG Tech*, 899 F.3d at 1285–86; *Simio*, 983 F.3d at 1364 ("the abstract idea itself…cannot supply the inventive concept…." (internal quotations and citations omitted)).

14

Even if considered as "as an ordered combination," the complete method of claim 1 adds nothing that is not already present when the steps are considered separately. *Alice*, 573 U.S. at 225-226. As explained *supra*, the steps are directed to compiling information, verifying information, and sorting. Even when taken all together, the steps are nothing more than instructions to carry out these ideas. They do not combine to improve the functioning of the claimed database. *See id.* Nor do they effect an improvement in any other technology or technical field. *See id.* This is not "enough" to transform an abstract idea into a patent-eligible invention. *Id.*

Thus, claim 1 does not contain an inventive concept sufficient to transform the abstract idea identified in *Alice* step one into an eligible claim. Claim 1 of the '158 patent is, therefore, invalid under 35 U.S.C. § 101.

### 3. Independent claims 17 and 23 are directed to the same non-inventive abstract idea as claim 1.

When viewed side-by-side, independent claims 1, 17, and 23 overlap element-by-element:

| Claim 1 | Claim 17 | Claim 23 |
|---|---|---|
| A method for using and managing a database, the method comprising: | A computerized system for managing and using a database over a computer network, the system comprising a server system linked to the network and accessible by users via their communication devices connectable to the network, said server system comprising a processor utility, which is associated with | A computerized system for managing and using a data base, the system comprising a server system accessible by users via their communication devices connectable to the server system, said server system comprising a processor utility, which is associated with |
| [a] providing a verified database of a plurality of identified individuals, the verified database comprising a plurality of individual-identifier data sets (IDSs) and relationship data; and | [a] a verified database of a plurality of identified individuals comprising a plurality of individual-identifier data sets (IDSs) and relationship data and which is adapted to carry out the following; | [a] a verified database of a plurality of identified individuals comprising a plurality of individual-identifier data sets (IDSs) and relationship data and which is adapted to carry out the following: |

15

| | | |
|---|---|---|
| [b] processing said verified database in accordance with one or more parameters or conditions selected in accordance with at least one medical application and creating a sub-group database including data records of the individuals from the verified database having said one or more selected parameters or conditions, thereby allowing collection of data comprising one or more selected parameters or conditions and delivery of at least part of the collected data to one or more users and enable to apply data from said verified database to provide personalized medicine service to at least one of said identified individuals; | [b] process said verified database in accordance with one or more parameters or conditions selected according to at least one medical application and create a sub-group database comprising data about at least some of the identified individuals characterized by said one or more selected parameters or conditions, and apply data from said verified database in order to provide a personalized medicine service to at least one of said identified individuals; configured to carry out the following: | [b] process said verified database in accordance with one or more parameters or conditions selected according to at least one medical application and create a sub-group database comprising data about at least some of the identified individuals characterized by said one or more selected parameters or conditions, and apply data from said verified database in order to provide a personalized medicine service to at least one of said identified individuals; |
| [c] wherein said providing of the verified database comprises: permitting a plurality of individuals to enter individual-associated data bits (IDBS) into a computerized system, each of the IDBs comprising at least one personal identifier relating to the individual and relationship data comprising data on one or more related individuals and the nature of relationship; | [c] receive a plurality of individual-associated data bits (IDBS) entered by clients, the IDBs comprising personal identifiers and relationship data, the relationship data comprising data on one or more related individuals and the nature of relationship, | [c] wherein said providing of the verified database comprises:<br><br>permitting a plurality of individuals to enter individual associated data bits (IDBS) into a computerized system, each of the IDBS comprising at least one personal identifier relating to the individual and relationship data comprising data on one or more related individuals and the nature of relationship; |
| [d] processing the entered IDBs to generate the IDS, one for each identified individual, being either said individual who has entered | [d] generate an individual identifier data set (IDS), one for each identified individual, being either one of the users or one of the related individuals, process | [d] processing the entered IDBs to generate the IDS, one for each identified individual, being either said individual who has entered the |

QB\68580957.4

| | | |
|---|---|---|
| the individual-associated data bits or one of the related individuals and construct the verified database comprising IDSs of identified individuals. | all the IDSs and construct a verified database comprising IDSs of identified individuals and their position in a relationship web, and process the information in said verified database according to said at least one selected parameter or condition and create the corresponding sub-group database of at least some of said identified individuals. | individual-associated data bits or one of the related individuals and construct the verified database comprising IDSs of identified individuals. |

Thus, claims 17 and 23 are directed to the same abstract idea as claim 1, i.e., compiling information on multiple people into a database (steps (a) and (c)), verifying that information by cross-referencing data points (step (d)), and processing the database to create a subset of data (step (b)). *See supra* II.B.1 & IV.A.1.

Under *Alice* step two, the only elements claims 17 and 23 recite other than that abstract idea are conventional devices like: "a computerized system," "a computer network," "a server system," and "communication devices." Like the database recited in claim 1, these devices are neither claimed nor described in the specification as being anything other than conventional fare. ('158 Pat. at 17:1-18:5). Additionally, when viewed as an ordered combination, claims 17 and 23 simply instruct that the abstract idea be carried out using the recited "computerized system," "computer network," "server system," and "communication devices," with no explanation for *how* this should be done. *See Preservation Wellness Techs. LLC v. Allscripts Healthcare Sols.*, No. 2:15-CV-1559-WCB, 2016 WL 2742379, at *9-10 (E.D. Tex. May 10, 2016) (Bryson, J.), *aff'd sub nom. Pres. Wellness Techs. LLC v. Allscripts Healthcare Sols. Inc.*, 684 F. App'x 970 (Fed. Cir. 2017). The claims do not purport to combine these devices in a manner that improves their function. *See Alice*, 573 U.S. at 225-26. Nor do the claims purport to carry out an improvement in any other technology or technical field. *See id.* "[I]f a patent's recitation of a computer amounts to

17

a mere instruction to 'implemen[t]' an abstract idea 'on ... a computer,' that addition cannot impart patent eligibility." *Id.* at 223 (internal citations omitted).

Thus, like claim 1, independent claims 17 and 23 are invalid under 35 U.S.C. § 101.

### 4.    Each of the dependent claims also is ineligible.

The dependent claims of the '158 Patent do not add any elements or limitations that make the claims any less abstract or any more inventive. Claims 2 and 18 merely specify that the processing step/processor utility be initiated by/responsive to a user, and claim 3 specifies a user whose data is in the database. ('158 Pat. at Cl. 2 ("wherein said processing of the verified database … is initiated by a request from a user"); *id.* at Cl. 3 ("wherein said user is the individual whose data is included in the verified database"); *id.* at Cl. 18 ("wherein said processor utility is responsive to a user request ….")). These variations do not change the abstract nature of the claims—they are still directed to collecting, verifying, and sorting information on people. Nor do these variations provide any additional detail on how these activities can/should be carried out. Moreover, to the extent these variations result in improved information as stored within or outputted by the database, that is not an equivalent to an improved database itself, or any other feature within the claims. *See BSG Tech*, 899 F.3d at 1287 ("While the presentation of summary comparison usage information to users improves the quality of the information added to the database, an improvement to the information stored by a database is not equivalent to an improvement in the database's functionality.").

Claims 4-5 and 19-21 merely specify that the processing step/processor utility generate a request to at least some of the individuals and/or update the database with the data received. ('158 Pat. at Cl. 4 ("generating a request to at least some of the individuals"); *id.* at Cl. 5 ("updating the verified database with the additional data received from at least some of the individuals"); *id.* at Cl. 19 ("to generate a request to at least some of said identified individuals"); *id.* at Cl. 20

18

("configured for updating the verified database with said additional data")). In effect, these claims merely narrow the abstract idea to more specific subsets of individuals/users and a potentially smaller subset of information, but narrowing the abstract idea does not make it any less abstract or any more inventive. *See BSG Tech*, 899 F.3d at 1287 ("a claim is not patent eligible merely because it applies an abstract idea in a narrow way") (citing *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329 (Fed. Cir. 2017)). Like the independent claims, these claims do not purport to improve the recited database or devices; nor do they purport to solve any particular problem in the field of databases. They simply command that the ideas of generating requests/updating the database be carried out without any additional explanation of how this can/should be done.

Claims 9-11 merely add filtering a subgroup of individuals during the processing step, providing a product or service to an individual in the subgroup, and doing so in response to information pertaining to an individual. ('158 Pat. at Cl. 9-11). As with the independent claims, neither the claims themselves nor the specification teach any novel means of completing these tasks, just that they may be carried-out by conventional computers or servers. In effect, the claims simply command that "at least one of a product and a service" be provided to an individual based on information known about that individual. Adding this abstract concept to an already abstract idea does not elevate it in any meaningful way. *Boom! Payments*, 839 F. App'x 528, 532 ("overlay[ing] a second layer of abstraction" does not elevate an abstract idea).

Claims 7, 12, 14, and 22 specify that the processing step/system creates a "medical database" or a "family database" ('158 Pat. at Cl. 7, 12, 14, 22), but the specification does not teach any novel way of compiling these named databases; it simply teaches that they are comprised of certain types of information common to their applications. (*Id.* at 3:45-53 ("Such medical data

19

base may comprise information pertaining to at least one of a disease, a medical condition, a genotype, a phenotype, a family relationship; and a geographic location of at least one of the identified individuals."); *id.* at 13:45-53 ("Thus, the IDS of each individual may be viewed as a relationship database, in particular a family database of individuals related to said first individual.")). Likewise, claim 13 specifies that information may be consolidated to create an "expanded relationship data record" and claim 15 specifies that the database be compiled with a "personalized medical record," but, again, the specification does not teach any novel way of consolidating this information, it merely contemplates "consolidating … at least two relationship data pieces to construct an expanded relationship data record" and having "hospitals/medical centers … provid[ing] updated personalized medical records." (*Id.* at 5:13-29; *id.* at 19:23-28 & 19:62-20:2); *see also Preservation Wellness*, 2016 WL 2742379, at *10 ("If the [claimed function] does have a structural definition, but that definition is so well known that it need not be described in the patent to be understood by a person of ordinary skill in the art, then that structure is simply a conventional structure that functions in a well-known manner and thus is insufficient to contribute the required 'inventive concept' for purposes of section 101 analysis.").

Claims 6, 8, and 16 provide more specific—but not any less abstract—applications for the method or a step of the method ('158 Pat. at Cl. 6 (parameters and conditions selected from list of applications), *id.* at Cl. 8 (medical application based on personalized medicine), *id.* at Cl. 16 (personalized medial service selected from treatment, prevention, or prediction services). Simply reciting that an abstract idea take place in a "generic environment" does not save that idea from abstraction. *BSG Tech*, 899 F.3d at 1288; *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). "[L]imitation of the claims to a particular field of information … does not move the claims out of the realm of abstract ideas." *SAP America,*

898 F.3d at 1169.  Based on the foregoing, the claims of the '158 Patent are directed to patent-ineligible subject matter and must be cancelled as failing the requirements of 35 U.S.C. § 101.

**B.      The '309 Patent Is Directed to Patent-Ineligible Subject Matter.**

Although DatRec alleges that "[t]he '309 Patent relates to a novel and improved system for secure communications over a public network" (dkt. 1, ¶ 15), the *claims* of that patent are directed to something far more generic, namely building a conventional database with information on multiple people and then establishing communication preferences based on how reliable the information is. These are quintessential abstract concepts that cannot be patented.

**1.      Claim 1 is directed to an abstract method under *Alice* step 1.**

The '309 Patent's independent claim 1 recites:

> 1. A method for communication between users over a communication network, comprising:
>     (a) providing a database which comprises verified data relating to identity of an individual, said database being accessible through the network and the verified data being used for authenticating the identity of the individual, the database being constructed by;
>         permitting a plurality of individuals related to the said individual to each enter data on the individual wherein the data is an individual-associated data bits (IDB) comprising a personal identifier and relationship data indicative of a family tree,
>         generating an individual-associated data set (IDS) from the IDB wherein the IDS comprises data on the individual and related individuals,
>         verifying the IDS for the individual by determining the level of reliability based on a degree of similarity between data on the individual entered by different individuals, and
>     (b) compiling the individual data sets (IDSs) to construct the database, and defining one or more levels of permitted communication between individuals in the database and the verified individual on the basis of the verification.

('309 Pat. at 19:11-34).

Part (a) and the first half of part (b) of claim 1 recite steps for building a conventional database, i.e., "providing" the database and "compiling [data] to construct the database," where the additional limitations merely define the source and type of data used to construct that database

or recite analytical steps performed on the data. Neither claim 1 nor the specification of the '309 Patent suggests, let alone requires, that the database is anything other than a standard, conventional database. *BSG Tech*, 899 F.3d at 1285–86 (holding that "[i]f a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea"); *cf. Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (holding that "the self-referential table recited in the claims … is a specific type of data structure designed to improve the way a computer stores and retrieves data in memory[, as compared to t]he specification's disparagement of conventional data structures…").

Once the database is built, the second half of step (b) then uses that information to "defin[e] one or more levels of permitted communication" between people. In particular, the '309 Patent teaches that:

> In general, the present invention provides means for verifying identity of a user that is or may be a party of an electronic communication. Through such verification users may be identified and classified into different classes, for example: a class of users the identity of whom is verified with a defined degree of reliability and are thus permitted to communicate with other users or a subset of other users; a class of users the identity of whom is verified with a lower degree of reliability and are thus permitted only a low level of communication with other users or a subset of other users. A non-limiting example is an electronic filter permitting email communication or other type of electronic messaging only of verified users and rejecting others or permitting only a limited degree (or "flagged") communication with non-verified users.

('309 Pat. at 2:4-17). In other words, "defining one or more levels of permitted communication" may include, e.g., establishing groups of users that are permitted to communicate with one another due to the fact that those users' identities are all acceptably verified or indicating that fewer types of communication are available as between less reliably verified users.

Thus, as noted above, the focus of the claims under the first step of *Alice*, is directed to the abstract idea of building a conventional database with information on multiple people and then

analyzing that data to establish communication preferences based on how reliable the information is. Essentially, this abstract idea is no more than rudimentary data processing, where the data processing comprises receiving data, analyzing it, and then using the results of that analysis to generate a filtering scheme, which the Federal Circuit has held on multiple occasions to be unpatentable under Section 101.

With regard to the database building and data analysis portions of the claim, the Federal Circuit has held that "a process of gathering and analyzing information of a specified content, then displaying the results" is an ineligible abstract idea. *Elec. Power Grp.*, 830 F.3d at 1354. Similarly, in *Content Extraction*, the court held that "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory," represented an ineligible abstract idea because "[t]he concept of data collection, recognition, and storage is undisputedly well-known." 776 F.3d at 1347. And in *FairWarning IP LLC v. Iatric Systems, Inc.*, the court held that "collect[ing] information," "analyz[ing] that information according to one of several rules," and "provid[ing] notification" as a result of that analysis is an ineligible abstract idea. 839 F.3d 1089, 1093 (Fed. Cir. 2016).

With regard to the filtering scheme of claim 1 that defines the one or more levels of permitted communication, the concept of filtering or screening communications based on verification or authentication is also abstract. *EasyWeb Innovations, LLC v. Twitter, Inc.*, 689 F. App'x 969, 970, 548, 2017 WL 1969492 (Fed. Cir. 2017) (holding that claims directed to "message publishing system that accepts messages in multiple ways …, verifies the message was sent by an authorized sender, and converts and publishes the message" are abstract); *see also NetSoc, LLC v. Match Grp., LLC*, 838 F. App'x 544, 2020 WL 7828777 (Fed. Cir. 2020) (holding that "'maintaining' a list of participants, 'presenting' a user with selectable categories, 'displaying'

participant information based on the selected category, 'shielding' contact information, 'enabling' the user to send a message to participants, 'tracking' a response time of participants, and 'updating' participant ratings are all human activities that [are abstract, even though] the claims more efficiently organize [them] by applying them to a 'network computer system'"); *Bascom*, 827 F.3d at 1348 (holding claims eligible at *Alice* step two for including a novel arrangement of computer components, but indicating at step one "that filtering content is an abstract idea because it is a longstanding, well-known method of organizing human behavior, similar to concepts previously found to be abstract").

In essence, after the conventional data gathering and analysis steps of the first part of claim 1, the filtering scheme of claim 1 that defines the level(s) of permitted communication between individuals is an abstract method of organizing human activity, which is not a patentable concept. *See Preservation Wellness*, 2016 WL 2742379, at *7 ("controlling access based on eligibility does not render the otherwise abstract idea any less abstract").

Thus, claim 1 is directed to an ineligible abstract idea under *Alice* step one.

## 2.   Claim 1 contains no inventive concept under *Alice* step 2.

Under the second step of *Alice*, claim 1 does not contain any inventive concepts that transform it into patent-eligible subject matter. In addition to the elements of claim 1 that define the abstract idea discussed above, claim 1 includes limitations directed to the type of analysis performed on the data and the method of filtering or screening communications according to the defined level(s) of communication. However, as discussed below, each of these elements is recited at a high level of generality that is insufficient to transform the identified abstract idea into an eligible claim. *Alice*, 573 U.S. at 222 ("'Simply appending conventional steps, specified at a high level of generality,' [is] not '*enough*' to supply an 'inventive concept.'") (quoting *Mayo*

24

*Collaborative Services v. Prometheus Labs., Inc.*, 566 U.S. 55, 82, 77, 72 (2012) (emphasis in original)).

The specific type of data analysis recited in claim 1, i.e., the process of authenticating or verifying information, does not make claim 1 any less abstract, particularly because that process is only recited at a high level of generality. Specifically, claim 1 only states that the IDS for an individual is verified "by determining the level of reliability based on a degree of similarity between data on the individual entered by different individuals." ('309 Pat. at 19:26-29). The specification of the '309 Patent further teaches that this "degree of similarity" can be obtained by cross-referencing and comparing information and that means for completing this task were already known in the art. (*See id*. at 14:10-15 ("Those skilled in the art will readily appreciate that other embodiments of person identifiers may be implemented and different comparing algorithms may operate on any or all person identifiers and may use methods known to those skilled in the art or methods that are apparent in light of this disclosure.")); *see also Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 978 (Fed. Cir. 2020) (indicating that "receiving data from two financial records, storing that data, comparing that data, and displaying the results" is an ineligible abstract idea), *cert. denied*, 141 S. Ct. 1053 (2021).

Additionally, the process of defining "levels of reliability" does not make the claim any less abstract. Neither claim 1 nor the specification more generally prescribes any particular algorithms for calculating the levels of reliability and teaches that they may be determined by assigning whole numbers (*e.g.*, '309 Pat. at 16:10 ("The highest reliability score is 10 and the lowest is zero")) based on the number of matched cross-references. *CardioNet*, 816 F. App'x 471, 477 (holding that a mathematical computation performed by a general-purpose computing device

that "could otherwise be performed by a human, mentally or with pen and paper" is abstract) (internal quotations omitted).

Arguably, the most "unconventional" feature of the claims is the concept of screening communications based on the reliability associated with an individual's identity, but, as discussed above, this feature is recited at a high level of generality. As for specific methods of carrying out that step, the specification teaches that there were already-known, conventional means of carrying out the abstraction. ('309 Pat. at 6:64-66 ("The references cited in the background teach many principles of computerized management of related data records that are applicable to the present invention.")); *Bozeman*, 955 F.3d at 980 (no inventive concept for abstract verification method where specification taught the technological components were "off-the-self, conventional computer, storage, network, and display technology"); *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1169 (Fed. Cir. 2019) (no inventive concept where the background describes claimed steps as conventional), *cert. denied*, 140 S. Ct. 2515 (2020).

When viewed as an "ordered combination," these additional elements in combination with the components of claim 1 that define the abstract idea, amount to no more than applying that abstract idea in a generic computer environment using generalized, conventional analytical methods. *Alice*, 573 U.S. at 217. As the Court held in *Alice*, "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention[, nor is s]tating an abstract idea while adding the words 'apply it' … [n]or is limiting the use of an abstract idea 'to a particular technological environment.'" *Id*. at 223 (internal citations omitted).

Thus, claim 1 does not contain an inventive concept sufficient to transform the abstract idea identified in *Alice* step one into an eligible claim. Claim 1 of the '309 Patent is, therefore, invalid under 35 U.S.C. § 101.

### 3. Independent claim 9 is directed to the same non-inventive abstract idea as claim 1.

When viewed side-by-side, the court can see that claims 1 and 9 overlap in scope and that

claim 9 is, in fact, broader than claim 1:

| Claim 1 | Claim 9 | Explanation of Similarities Between Claims 1 and 9 |
|---|---|---|
| A method for communication between users over a communication network, comprising: | A system for enabling communication between users over a communication network, the system comprising; | A system or method permitting people to talk to one another |
| (a) providing a database which comprises verified data relating to identity of an individual, | a server system associated with a database comprising verified data relating to an individual, | Conventional computer database with information on multiple people |
| said database being accessible through the network and the verified data being used for authenticating the identity of the individual, | said server system being configured and operable to verify at least some of the data so as to authenticate an identity of the individual; | Using conventional computer components to authenticate a person's identity |
| the database being constructed by; permitting a plurality of individuals related to the said individual to each enter data on the individual wherein the data is an individual-associated data bits (IDB) comprising a personal identifier and relationship data indicative of a family tree, generating an individual-associated data set (IDS) from the IDB wherein the IDS comprises data on the individual and related individuals, | N/A | N/A |

| Claim 1 | Claim 9 | Explanation of Similarities Between Claims 1 and 9 |
|---|---|---|
| verifying the IDS for the individual by determining the level of reliability based on a degree of similarity between data on the individual entered by different individuals, and | determining a level of reliability in authenticity based on correspondence between data on said individual entered by a plurality of related individuals; | Assessing how reliable information about a person is, based on the degree to which information about that person that comes from multiple people matches |
| (b) compiling the individual data sets (IDSs) to construct the database, and | N/A | N/A |
| defining one or more levels of permitted communication between individuals in the database and the verified individual on the basis of the verification. | and the system being configured to define one or more levels of permitted communication between individuals in the database and the verified individual on the basis of said verification. | Establishing communication preferences based on how reliable the information is |

Thus, claim 9 is directed to the same abstract idea under *Alice* step one as claim 1, i.e., building a conventional database with information on multiple people and then analyzing that data to establish communication preferences based on how reliable the information is. *See supra* IV.B.1.

Under *Alice* step two, the only element of claim 9 in addition to that abstract idea is "a server system." However, that server, like the database recited in claims 1 and 9, is neither claimed nor described in the specification as being anything other than a standard, conventional computer component. ('309 Pat. at 6:21-63). Additionally, when viewed as an ordered combination, claim 9 simply recites the abstract idea as implemented using a server system. However, "if a patent's recitation of a computer amounts to a mere instruction to 'implemen[t]' an abstract idea 'on ... a computer,' that addition cannot impart patent eligibility." *Alice*, 573 U.S. at 223 (internal citations omitted).

Thus, like claim 1, independent claim 9 is invalid under 35 U.S.C. § 101.

28

### 4.   Each of the dependent claims also is ineligible.

The dependent claims do not add any elements or limitations that make them any less abstract. Claim 8 is directed to a "computerized system" that can carry out the steps of claim 1, and claim 10 is the system of claim 9, but specifies that the claimed server system creates the claimed database. As with the independent claims, the specification does not teach any novel means of completing these steps, just that they may be carried-out by the system. ('309 Pat. at 4:20-28 ("The server system is configured and operable to verify at least some of the data so as to authenticate an identity of the individual, thus allowing to define one or more levels of permitted communication between individuals in said database and the user on the basis of said verification."); *id.* at 10:52-54 ("the system operates to determine whether a match between data bits…. is reliable")).

Claims 2-4 specify defining a level of communication with a "graded personalized receiving mechanism," but the specification does not teach anything novel about this mechanism that saves the claims from abstraction. Rather, the specification teaches that the "graded personalized receiving mechanism" is an undefined means for an individual to screen communications from other individuals based on what is known about those other individuals, similar to a person deciding to answer a phone call if they recognize the caller's number or deciding not to answer the call and let it go to voicemail if they do not recognize the number or if it does not register as corresponding to a number belonging to one of their saved contacts. (*Id.* at 3:31-36 ("Typically, the mechanism provides a personalized protection level responsive to the type of communication. In some cases, the graded personalized receiving mechanism enables an authenticated user to expose his identity at different levels responsive to the [sic] at least one of a sender and a recipient of the communication.")).

Likewise, claims 5-7 specify authenticating the identity of individuals by providing a user a "score" for the reliability of the data, wherein the data may be received from the user or another, but again, the specification does not teach anything novel about this scoring, noting instead that means of such scoring are known in the art and can be carried out by conventional computers and servers. (*See e.g.*, *id.* at 16:10; 10:52-54)

Claims 11-13 and 16 depend from claim 1 and specify variations for the method "providing an organizational chart of data." Neither the specification nor the claims limit this step to any particular method of "providing" such a chart. Instead, the specification merely describes the chart in terms of a visual representation of data. (*Id.* at 16:46-50 ("The family tree may be organized into an organizational chart, in which the user (Simon son of Jacob, or Simon Jacobs) is in a central circle, around which concentric annuli are disposed relating to family members starting from the first degree family members…..."); *id.* at 17:5-9 ("According to some other embodiments, there may be two organizational charts comprising the same family members, one for the individual to decide on the family members from whom he wants to receive information, and the other to whom he wants to provide information.")).

Claim 17 depends from claim 16 and merely provides that the chart display individuals based on a specified list of parameters. But narrowing an idea in this manner does not save it from abstraction. *BSG Tech*, 899 F.3d at 1285–86; *Simio*, 983 F.3d at 1364.

Claims 13-15 depend from claim 11 and specify use of a "control button" to effectuate variations of the screening step. The specification does not teach how this button works, just that it may form part of a graphical user interface and can be activated to screen communications. ('309 Pat. at 16:35-38 ("The screen may for example be facilitated by the appropriately configured user interface. For example, such user interface may be configured to provide the user with template,

navigation and control buttons, and the user's family tree."); *id.* at 17:33-35 ("As indicated above the user interface may provide navigation and control buttons to assist the user in activating and using the organizational chart."). *See Simio*, 983 F.3d at 1363 ("using graphical processes to simplify simulation building has been done since the 1980s and 1990s" and "applying the already-widespread practice of using graphics …" in a well-known environment is abstract).

Based on the foregoing, the claims of the '158 Patent are directed to patent-ineligible subject matter and must be cancelled as failing the requirements of 35 U.S.C. § 101.

### C.   No Claim Construction Issues or Factual Disputes Prevent the Court From Deciding This Issue at This Stage of the Case.

This motion is ripe for decision now. The claims at-issue do not require formal construction. Despite peppering the claims with acronyms like "IBDs" and "IDSs," these terms are readily understood as the specifications of both patents provide explicit definitions. ('158 Pat. at (defining "IDBs"), 8:44-61 (defining "personal identifier"), 8:62-9:11 (defining "relationship data"), 9:12-38 (defining "IDSs"); '309 Pat. at 5:11-17 (defining "IDBs" as including both personal identifiers and relationship data), 5: 5:17-27 (defining "personal identifier" as pieces of data on the data-entering individual), 5:40-56 (defining "relationship data" as data relating to individuals with a relationship to the data-entering individual and the type of relationship), 5:57-61 (defining "IDSs" as a set of data pertaining to an individual generated by processing IDBs)). Any other terms carry their plain and ordinary meaning. Moreover, even adopting the most generous constructions for purposes of this motion, the arguments do not change.

Beyond that, no factual issues would prevent the Court from deciding this motion now. The specifications themselves teach that the means of carrying out the claimed methods and systems are conventional. ('158 Pat. at 17:1-18:5 ("The server system is configured according to the invention to carry out the above-described method for creating the main verified database

31

including the IDSs of all identified individuals and the relationship web, based on data received from the users, being initiated in either pull or push mode."); *see also* 26:58-63 ("the IDSs containing database … may be used for a variety of uses for which computer networks have not been used hitherto…); '309 Pat. at 6:64-66 ("The references cited in the background teach many principles of computerized management of related data records that are applicable to the present invention.")). These teachings are sufficient to decide this motion; no discovery is needed. *See Enco Sys., Inc. v. DaVincia, LLC*, 845 F. App'x 953, 958, 2021 WL 855856 (Fed. Cir. 2021) (citing *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) ("In ruling on a 12(b)(6) motion, a court need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' such as the claims and the patent specification." (citation omitted))).

Thus, this case is unlike *Berkheimer v. HP Inc.*, where the Federal Circuit noted that the specification explicitly "describe[d] an inventive feature that store[d] parsed data in a purportedly unconventional manner." 881 F.3d 1360, 1369 (Fed. Cir. 2018). There, the Federal Circuit examined whether the improvement described in the specification was captured in the claims. For those claims that recited the alleged improvement, the Federal Circuit found a genuine "factual dispute regarding whether the invention describe[d] well-understood, routine, and conventional activities." *Id.* But where the claims did not recite the purportedly inventive feature, the Federal Circuit concluded that they were directed to patent-ineligible subject matter under § 101. *Id.* Here, neither the claims nor the specification describes any unconventional components or use of conventional components in some unconventional manner.

Accordingly, the claims' eligibility is ripe for the Court's consideration, and the asserted claims should be found invalid for failing to claim patent-eligible subject matter.

## V.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion and find that the claims of the '158 Patent and the '309 Patent are invalid and dismiss DatRec's Complaint with prejudice.

Dated: <u>June 9, 2021</u>                              **QUARLES & BRADY LLP**

By: *<u>/s/ Kristin Graham Noel</u>*
Kristin Graham Noel
Martha Jahn Snyder
Anita Marie Boor
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251-5000
Facsimile: (608) 251-9166
kristin.noel@quarles.com
martha.snyder@quarles.com
anita.boor@quarles.com

*Attorneys for Defendant Epic Systems Corporation*

QB\68580957.4